Good morning. Thank you, Your Honor. May it please the Court, my name is Gene Summerlin, appearing on behalf of the appellants. If this Court finds that Congress diminished the western portion of the Omaha Indian Reservation, absolutely nothing will change in the manner in which jurisdiction has been exercised over that reservation, in which social services have been provided on the western portion of the reservation, and the manner in which governmental services have been provided on the reservation since the early 1880s until the very recent past. What about the U.S. Attorney's announcement that federal criminal jurisdiction has been asserted and will be pursued? That's correct, but that is... It's either or jurisdictional situation, isn't it? Definitely, Your Honor, but again, that's a development that's occurred in the very recent past, so I was referring more... So there's been no serious felony federal prosecution? That's my understanding, Your Honor. There's been, in fact, in the record, there's no evidence of any exercise of federal or tribal jurisdiction on the western half of the reservation from essentially the 1880s up until very recently. And this is true because the land west of the railroad right-of-way never possessed any Indian character. Prior to the 1872 Act, the tribe was not utilizing that land. They didn't have any improvements on the land, houses, fencing, anything like that. The tribe's primary area of residence and use was east, the eastern portion of the reservation. Secondly, the tribe sought on a continual basis to get rid of the western portion of the reservation, to sell that so that they could raise funds for farming and other uses. Beginning in 1871, the tribe petitioned Congress to separate and sell that area west... Well, at least sell. Definitely. But the actual language that the tribe used was to separate this land from the remainder of the reservation. And in 1872, when Congress passed the 1872 Act, they repeated that language. The 1872 Act provided that this area on the western portion of the reservation would be separated from the remainder of the reservation and offered for sale. Are you saying now that the 1872 Act was a diminishment or just the 1882 Act? It's our position that the 1872 Act and the 1882 Act have to be read in concert because as you look at the surrounding circumstances... That wasn't my question. I'm sorry. Your question was whether your position now is that the 1872 Act itself was a diminishment of the reservation. I don't believe that that's the case. Okay. That's what I thought was your position, but you just said, well, the 1872 Act uses the language of separation, and I thought your diminishment argument hinged on the language of separation, so it would seem to follow that you must think the 1872 Act diminished. Well, I think... If it didn't, then separation language apparently isn't dispositive. It's not dispositive at all, but it does fall into the Solemn Analysis of looking at the surrounding circumstances of the 1882 Act. And so our position is the 1882 Act is informed somewhat by the language of the 1872 Act and what the tribe had been trying to do with this area. And when you move into the 1882 Act, again, there you're talking about legislation which treats the western portion of the reservation quite differently than the eastern portion. So with respect to the western portion of the reservation, that Act provides that all of the western portion west of the railroad right-of-way will be open for settlement by non-tribe members. On the other hand, looking at the eastern portion of the reservation, that area will be allotted, open for allotment to tribe members with the land that's not allotted to tribe members then being deeded or patented to the tribe in common. So there you've got an indication of congressional intent. Certainly not the type of congressional intent that this court has previously found to be, you know, essentially an irrebuttable presumption of diminishment. Is there any Supreme Court precedent where they have looked at two separate Acts enacted 10 years apart, 1872 and 1882, to look at the factors that they have set forth that we should look at? I believe that's what the court did in Yankton, where they took a number of kind of related Acts in the 1900s, and they used some of the earlier Acts to inform as to the language of the later Acts and what Congress's intent was. Here, again, looking at the 1882 Act, on the eastern side of the reservation, you've got tribal interests that are being retained in that land. On the western side, there's none. And I think that that is a key distinction, because when you look at the cases where the courts have not found diminishment, there generally is some type of tribal interest, whether it's a mineral right, timber rights, land that's being retained for some tribal purpose. There's some continuing tribal interest in the land which, you know, is being claimed to be diminished. Where here, I think you've got a very clear separation. Not only do you not have Indian character in the past or current use at the time of these Acts, but Congress is not saying we're going to reserve some rights for the tribe in this area west of the railroad right-of-way. And I think as you look at the legislative history of the 1882 Act, that that's confirmed. You begin with Representative Valentine's statement that, you know, he's spoken with the tribe, and the tribe's desire is to sell this western portion west of the railroad right-of-way so that the non-tribe members will settle that area, create improvements. They will develop the area up from the western side. The tribe itself will then develop the area up to the eastern side, and the railroad right-of-way will serve the boundary. I mean, that's a statement... Is the 1882 Act textually any stronger for your position than the Act in SOMA? Well, I don't know that it is. You know, we certainly do not have the sell, cede, and convey language or some certain. So there's no question that we don't fall within kind of that almost irrebuttable presumption of diminishment. It's not indisposed on allotted land. Correct. Not enough, not good enough. Well, it's... As far as the restoring the public domain in Hagen, that's good enough. Correct. Where does this... I mean, the word separate doesn't appear in any of these prior cases. That's true. And I think, Your Honor, what we would refer the court to is the fact that you have to consider all of the surrounding circumstances. So it's not simply a matter where the statutory language clearly will say you diminish this or you don't diminish it. It's an analysis of the statutory language, the legislative history, the immediate surrounding circumstances, and then, to a lesser extent, kind of the subsequent development of the land and what happened there. So our position is that when you look at the totality of it, and it does require more of a nuanced analysis. This is not a formulaic approach where you can rely on the statutory language to say clearly there was a diminishment here. And, again, going through the legislative history, not only do you have Representative Valentine's statement, but you've got Senator Saunders also explaining that this 1882 act will practically break up that portion of the reservation, at least that which is to be sold, and that the lands that the tribe occupy will be segregated. And going back for a moment, I mean, thinking about what diminishment is, you know, the Supreme Court has said you look at did Congress intend to reduce the size of the reservation? Did Congress intend to alter the boundaries of the reservation? As this court said in Gaffey, diminishment suggests that a discreet, easily identifiable parcel of land has been removed from reservation status. So looking at the legislative history and Senator Saunders' statement that this is practically breaking up that portion of the reservation, which is to be sold, it fits neatly within that Gaffey analysis. The other aspect here is that there was a congressional understanding that the act would reduce the size of the reservation. Statements in the congressional record show that Senator Saunders was concerned that, you know, would this leave enough land for the Omaha tribe if 50,000 acres were removed from the reservation? And so he went to the Commission of Indian Affairs. He went to the Indian agent to assure himself that that would leave a sufficiently sized reservation. It's also important, I think, that even though the 1882 act ultimately allowed tribe members to select allotments west of the railroad right-of-way, it was certainly Congress's understanding at the time that no tribe members would do so. Going back in history, when the tribe entered into their 1854 treaty and that allowed allotments, all of those allotments were taken on the eastern part of the reservation. The Indian agent had reported to Congress that there were no tribe members living on the western portion of the reservation. And Senator Saunders suggested that no tribe members, in response to a debate about whether, you know, this act was actually taking the best land of the reservation away from the tribe members and opening that for settlement, suggested that none of the tribe members desired to live on the western portion of the reservation. What portion of the land on the eastern part of the reservation is non-Indian owned land? Today? Today. I think a vast majority. There are some tables that we have in our brief that are also in the appendix that kind of walk through the percentage of Indian population east and west of the railroad right-of-way. Throughout the reservation. Well, it actually attempts to divide the western portion of the reservation from the eastern portion. East of the railroad right-of-way. Correct. You just said a vast majority was non-Indian owned east of the railway. Did you misspeak on that? I did not. I think today a vast majority of the land on both sides is non-Indian owned. These were allotments. Many of them were allotments that were later sold to non-Indians. Isn't that right? That is correct. So if we look to subsequent development, that doesn't tell us very much, does it? I think particularly as you move out in time, it tells us less. But if you look at that period immediately after the 1882 Act was adopted, what you see there is that from the very beginning, west of the railroad right-of-way, was populated, I believe, 99% non-tribe member. East of the railroad right-of-way, and I apologize, Your Honor, I don't have the exact number in my head, but I think it was something like, it was very different. The first census numbers we have, I believe, are from 1900. And there was a significant portion of tribe members east of the railroad right-of-way and a minuscule percentage west of the railroad right-of-way. And then over time, as happened with a number of these surplus land acts, as that land was owned by tribe members in fee, it ended up going out of tribal hands. As you look at that post-Act evidence, there are a number of things that I think are important. The fact that the Commissioner of Indian Affairs no longer treated or reported that 50,000 acres west of the railroad right-of-way as being part of the acreage of the Omaha Reservation. In 1890, the Indian agent described the land sold west of the railroad right-of-way as not being part of the Omaha Reservation. In 1901, the Indian agent reported that the railroad right-of-way served as the southwest boundary of the Omaha Reservation. And again, as you look at this subsequent history, and obviously as the Court has recognized, using subsequent history in an attempt to determine Congressional intent is a somewhat perilous matter. But certainly, the closer you are in time to the actual act of Congress, the more relevant that evidence would be. Your Honor, I'd like to reserve two minutes of my time for rebuttal, and I see I'm right at two minutes. Thank you. May it please the Court, my name is Blake Johnson, appearing on behalf of the State of Nebraska, which has intervened in this matter in support of the appellants. The State's consistent and virtually uncontested exercise of jurisdiction and provision of services in the area of Pender, Nebraska, has given rise to justifiable expectations in the residents of the area. That Pender isn't in the reservation? That's correct, Your Honor. But a good number of Native Americans have served on boards and all that sort of thing in Pender, haven't they? I think that the record would indicate that there have been some instances in which that has occurred. And the State's not attempting to dispute that there is some involvement. But when you look at the... And that's irrelevant. Is that your position, that those facts are irrelevant to our issues here today? Well, I think that when you look at the demographics of the area, throughout the 1900s, the census figures have shown that oftentimes the Native American population of the area in question is as low as 1%. And when you have that overwhelming population, the Supreme Court has recognized that it potentially creates an administrative and governmental burden on the State and local governments, unless there were necessarily a finding of de facto diminishment, which can, if you see a settlement population like that, it does bear on the intent of Congress and the intent of the parties when they initially pass the act. The tribe's recent attempt to impose the alcohol ordinance is really the only instance in which they've sort of gave rise to this lawsuit, but the only instance in which they've attempted to assert their sovereignty over the area. Despite its general exercise of jurisdiction just east of the right-of-way, the tribe has consistently not offered medical services, child protective services, or welfare services west of the right-of-way, and nor does it operate a school, industry, or business west of the right-of-way. Is there any factor of the participation of the United States government in the financing of those things? Is that brought to bear any reason why they are providing these services east of the right-of-way and not west? Certainly. I believe that's absolutely a factor. I think that's an indication that not only the tribe but the federal government understood that the State would assume actual jurisdiction over the area west of the right-of-way. Some bureaucrats in the federal government thought so. Certainly. But if you go back to the 1880s and the early 1900s, the situation seemed to remain the same throughout time. Weren't there some acts of Congress, if I'm remembering correctly, after 1882 that referred to the land west as part of the reservation? I think that the record is mixed on the legislative history. I think the acts may not have been purporting to necessarily define the reservation, but there was some ambiguity or some mixed evidence in terms of where the boundaries were. Again, I think that from the State's perspective, what has happened here is that you've had what this court and the Supreme Court has recognized as a potential doctrine where you see a de facto diminishment. And in Duncan Energy, the court certainly acknowledged the existence of that doctrine. You found that the doctrine was inapplicable under those circumstances because the area in question contained the tribal seat of government, half of the population was Native American, and the Native Americans had reserved the mineral rights underlying the land in the area. What's your best Supreme Court case that would say de facto diminishment? I think the Rosebud Sioux Tribe case would probably serve the State's or support the case of the State the best on the de facto diminishment argument. What big burden falls on the State of Nebraska if this land stays in the reservation or is in the reservation? It's hard to say what exactly the burden would be. I think that the questions of jurisdiction and the question of administrative burden is unsettled. I think we've gotten some guidance from the Supreme Court on those questions, but I'm not sure that it's clear. The greater concern really is the protection and upholding the justifiable expectations of the residents of Pender, Nebraska that have lived there and have developed their businesses and relationships based on the understanding that they were residing within the State of Nebraska rather than on the Omaha Tribe's reservation. That would be versus the expectations of the Native Americans that are involved, is that right? Certainly, but I think the expectations of the Tribe are that the boundary line was the railroad right-of-way. If there are no further questions, I'll address them. Am I right, the State views the entire 50,000 acres as the same? I mean, Pender sort of started the litigation fight, but in the State's view it's not distinct on this issue? No, no, Your Honor. I think that the State's view is that the boundary line is the railroad right-of-way and everything west of that. Despite the primary population center being Pender, Nebraska, the entire 50,000 acres was what the 82 Act intended to separate from the reservation. Thank you. Mr. Peterson? Thank you. May it please the Court, good morning. Mark Peterson on behalf of the Omaha Tribe and the various Tribal Council members who were named as parties. Your Honor, I think we need to start at the beginning and look at the Supreme Court analysis, which has been provided in the three prongs, or what I consider the prongs of which we are to look at. That is, first and foremost, the language of the statute itself that we're dealing with. Secondly, the historical context of that statute and the statutes and treaties around that. And third, only if the other two are ambiguous do we look at what our opponents want to look at, and that's that third prong, and that's the subsequent passage, subsequent to the passage of the Act. I don't read the Supreme Court as saying only if the first two don't solve it. No, I don't either. Your Honor, what it says is if it's... There's no dispute over the governing standard. Why are we spending so much time here defeating what's in agreement? Your Honor, then I guess I'd say that only to lead up to the issue of the cases which have dealt with or have found diminishment, I think can be categorized and then applied to our case and our facts, and that's the Dakota and the Yankton case, clearly used the language of seed and sell. The Rosebud case, which counsel just indicated is their belief of the most helpful case, is a situation in which the tribe had actually agreed by separate agreement to seed, sell, relinquish all title right to the property. That agreement, which I believe is probably properly in the second prong, but that agreement was incorporated into those statutes in the legislative history throughout. So the Rosebud case uses that same language as well. The Hagen case, which is the only other case which has found diminishment, used the language of restoring it to the public domain. And I think there's two things about that. First of all is that we don't have in this particular act that we're dealing with the Omaha tribe any language restoring it to the public domain. The other thing that may be not as clear in the briefing is that in the Hagen case, they talk a lot about restoring it to the public domain, and that meant that it was restored back to the United States government, which then allowed the United States government to homestead the property and did indeed homestead it to various settlers. What's interesting about this case is that when the Interior was specifically asked about the property west of the railway line in this particular statute, they said, no, that property is not subject to homestead laws, which tells you that they, at that point, in 1882 through 1892, never thought that this land was part of the reservation. If they did, or was not relinquished or diminished from the reservation, if they did, they would have allowed homesteading laws to apply. They did not. The clear implication there is that there was always a belief that this remained reservation property. Hagen involved the Dawes Act, right? Which was 1887. I believe that it... After this Act. I believe that it did, Your Honor. So where do I go in the record to see that the Interior Department, after the Dawes Act, said this land is different? Your Honor, as I read the Department of Interior comments on this particular statute... The timing is critical. Your Honor, I think if they... I think if the Department of Interior was referring to this property, I mean, and they were looking back to the 82... Was it before or after the Dawes Act? Well, Your Honor, the Department of Interior throughout, and the statutes throughout, even before and after the Dawes Act, with respect to this particular statute, continually went back to the Omaha tribe and asked them if they would allow for the payments to continue. All right? So if it was... If it left the reservation, if it was separated, why would they go back to the Omaha tribe at that point? It would have been U.S. government property. I mean, if the opponent's argument is right, there's no reason to go back. But they did, year after year after year, and continually, in response to Your Honor's question earlier, in 1890, they specifically said that the purchasers of the land west of the railway line were purchasers of land of the Omaha tribe. Right? I mean, specifically indicated that that land continued to be Omaha tribal territory. What do you think separate means in the statute? You just said, if it had been separated, as though separated means... Means anything? Relinquent. Well, no, the way you said it a minute ago sounded like separate was indicative of diminishment. But what do you think it means? I don't... You know, Your Honor, I don't think that the language that's used on the House floor or the Senate floor... No, this is in the law. And the separated law... The separate language is found in the 72 Act. It is not found in the 82 Act. Not in the 82 Act. Yep. And as Judge Kup said in his order, in looking at this, if that language had any relevance, the fact that it's absent in the 82 Act mitigates in favor of the tribe that this was not diminished. And I think that's an important point. Is there any allotments that have passed into the hands of non-Indians? Is that ever considered as land that's separated from the tribe or from the reservation? Not that I know of, Your Honor. I mean... And that stands for good reason. If that were true, as the Court pointed out just a few minutes ago, if that were true, then we'd have... You know, the reservation would be checkerboard and there'd be all sorts of... I mean, there would be no reservation. And that's simply not the law. There's already two or three Supreme Court opinions on our jurisdiction and so forth. Isn't that right? I'm not sure I understand the question, Your Honor. I'm sorry. Well, we have some jurisdiction under certain circumstances and local law applies... Certainly. ...zoning, planning, and land use and part of it the Indians' tribes, things like that. Exactly, Your Honor. And certainly the joint jurisdiction is not unique at all. And in fact, in our situation throughout time where there have been cross-deputization, you know, with the county, with the state patrol, that's all been fine. The parade of horribles that's been laid out is just simply wrong. There hasn't been that sort of issue. We've always had that issue. The only thing that changes for the state is the state goes back and continues to abide by the agreement they signed with the tribe and share in the tax revenue from the gas tax. They are holding those monies pending the outcome of this case, but that's the only thing that changes for the state. We continue to share. Under the Major Crimes Act, the tribe opted either to go federal or state for felony, serious felony prosecutions. I think... Doesn't this case drive that trend? I think it would. I think it would in the Pender area. Major, that's not joint jurisdiction. No, no. Right? That's right, Your Honor. But I think counsel is right. Is counsel right that the federal government has never exercised a major crime or the tribe has never attempted to get the federal government to assume federal Major Crimes Act jurisdiction? You know, Your Honor, the good news is I am unaware of a major crime involving an American Indian in the Pender area that that issue has come up. It just hasn't been an issue in the past. And I think that the Fed, you know, the Department of Omaha has indicated that if that comes up, it's their intent to do so. But I do think that leads to another good point, and that's this, is that, you know, with the reservation, you know, extending as it always has through the Pender area, you know, the criminal matters, you know, the ability for the tribe to affect criminal matters against non-tribal members is very limited, very, very limited by statute. On the civil side of it, you know, the enforcement or application of laws passed by the tribe against non-Indians is also limited by the Montana factors, which this Court has said in the Duncan case is a rather hard and strong, big hill to climb. It doesn't necessarily apply in this case because there is a specific statute on the alcohol, so Montana doesn't. The cost to the federal taxpayers of having to assume this criminal jurisdiction from afar when it's now handled by local law enforcement? No, Your Honor, I think the federal government on the major crimes would be based out of Omaha and Miss Gill, and that would... I mean, that's been true, you know, throughout time. I mean, I think they believe that they... It's hugely expensive in Minnesota, I know that. Yeah, I really don't see that, Your Honor. I mean, it's where this tribe sits in respect to the city of Omaha and where that seat is for prosecuting major crimes. I don't see that being a major issue at all. I think that office has continually believed, just as we all have, that that western portion of the boundary has always been reservation, and if an unfortunate incident like that came about, she would have prosecuted it straightaway. Thank you, Your Honor. When? I thought it's never been done. Well, it hasn't been. I'm saying if that would have occurred, and it has not, to my understanding. One question, Mike. Sure. I'm not familiar enough with the record. The 1882 Act says that with the consent of the Omaha tribe expressed in open counsel, the Secretary is authorized to survey and sell. Where in the record? How is that tribal consent reflected in the record? Your Honor, I'm not sure if there's... The tribal consent into the record itself, I'm not sure. It's not specifically in the statute. You addressed the importance of tribal consent in distinguishing some of the four cases. Right. So the manner of tribal consent in these actions is significant. Where is it here? Well, I think, Your Honor, it's important as to how they consent. The language that's used in this... I mean, I've seen the language. The language that we have found, Your Honor, in the legislative history dealing with the Omaha tribe in the 1882 Act was to the effect that the tribe was satisfied with the receipt of funds or something to that degree. That was the... I mean, a congressional staffer or a federal bureaucrat or something from the tribe. Yes, but which is distinct. To my... I don't know, Your Honor. I don't know. There isn't an agreement that I know of that the tribe signed. So that would be the best contemporaneous evidence of what the tribe thought the effect of the Act is, wouldn't it? Which is... You're telling me it's not in the record. Well, Your Honor, there is certainly nothing in the record that's even remotely close to an agreement, such as Rosebud or any of the other cases that found diminishment where the tribe specifically said and agreed to the fact that we relinquish, sell, convey all rights to that property. There are all kinds of pre-1882 history that I read in the briefs and in the district court's opinion about the tribe wanting to separate this land from the remainder of its reservation. So now they get a statute which doesn't use the word separate but requires tribal consent. I just... I guess I'm... Your Honor, the only thing I would disagree with is there is... I want to see the details. I want to see the details. Your Honor, the only thing I would disagree with is that there is certainly language that the tribe wished to receive funds in the sale of the property. That is, there is absolutely no... or I have certainly not found any, and Judge Kupf did not find any in the record, dealing with any historical evidence or comments ever made that there was to be a change in the boundaries of the reservation. And the concept of selling land inside a reservation to non-Indian is certainly not unique, not in 1882 or before or after. The idea of simply selling land for the benefit of the tribe that needed money at that point was not unusual at all. But the idea of actually ceding the land and selling it and changing the reservation line was indeed different and unique and certainly not done in this case, we believe. Thank you, Your Honor. Pardon? May it please the Court. Let me quickly recap on the statutory language prong of the diminishment analysis why that is compellingly in our favor, and that is because the 1882 Act is not only a run-of-the-mill surplus land act of the sort that has consistently been found not to affect a diminishment, but it also includes a provision for making allotments from the reservation at the same time that the reservation is open for sale. And the language in the Act expressly says that they may take allotments in any part of said reservation east or west of the right-of-way, clearly contemplating that the reservation continues east or west of the right-of-way. If the language is so abundantly clear, the United States has been on both sides of this issue with some consistency throughout this period of time, right? You know, I don't think the United States was on both sides of the issues. At the time, the Interior Department characterized the reservation as being diminished by 50,000 acres, but as the Supreme Court consistently... They weren't part of the government. No. As the Supreme Court consistently has said, the use of the term diminishment, even in statutes, including the Solemn Statute and other statutes, at that time often was used... generally was used to refer to the amount of land at issue, not diminishment of reservation boundaries. And diminishment, as I said, has been used in a number of statutes in which the Court has found there not to be diminishment. Also, let me say that the Interior Department used that language, referring... And it's clear, the agreement of the parties here and also in the legislative history, that in 1882, Congress still viewed the reservation to be totally intact. So whatever... However the Interior Department was using that language, it's meaningless for the purposes here because it's inconsistent with Congress's understanding as of 1882 that the whole... that the tribe had the whole of the reservation. Our brief provides a number of citations regarding that, and nobody here is maintaining that the 1872 Act affected the diminishment. A third key point for our statutory argument is that prior to the 1882 Act, the tribe had ceded in 1854 and 1865 land to the United States with the kind of language that is in those... you know, cession of all rights and relinquishment, exactly proposing here the exact same kind of contrast that this court in Duncan Energy said was particularly illuminating and that it would be contrary to the canon to resolve ambiguities in favor of the tribe to hold that the tribe had intended the same thing by two different... such different language. Now, on the context and the legislative history, of course, the courts... we were so compelling on the statute, you'd have to find an unequivocal evidence that the context and the legislative history demonstrated an intent to diminish. And it did not, and you know, the main reason we know that so compellingly is because the 1872 Act did not diminish. And the 1872 Act had basically the same language except less favorable to the tribe because it did not provide for the allotments. Congress cannot have intended to do something completely different in the 1882 Act with the exact same language. So the context is that Congress understood the 1872 Act did not diminish the reservation and it didn't do so in the 1882 Act either. And of course, as we set forth in our brief, it couldn't have because the boundary was changed. I mean, some of the land that would have been out of the reservation if it was diminished in 1872 was back in and vice versa. And also it allowed for allotments over in the side where the western side. So that clearly was still reservation. And there's really... and I have to say, in the reply briefs, the plaintiffs' appellants completely made no response to that argument on our part. They went totally to the demographics and the subsequent history, which is basically all they have, which this court also said in Duncan that exclusive reliance on the subsequent events is, you find, inappropriate. And it's inappropriate here, but in any event, the subsequent history is very much... is as much in our favor or more as it is in their favor. The important subsequent events are those that happened right around the time. And Congress enacted five statutes in the years after the 1882 Act up through 1894 in which it referred to the lands west of the right-of-way as reservation lands, which, again, Solemn relied on to find for support for its finding. And particularly important, just rather than just calling it reservation, the 1885 statute, and this is all in our brief, said that they were to... the interior was to appraise a portion of said reservation, a portion of the part that was on the western side that they hadn't yet addressed. Said reservation meaning right then, in 1885, it was still reservation. And then in 1886, they said, we will defer payment for those who shall settle, in the future, shall settle on said reservation. I mean, it said who have or shall settle. So it's clear that the reservation, that the western side continued to be reservation land after the 1882 Act was passed. And the plaintiff's appellants provide no theory under which diminishment could have occurred if it wasn't placed back in the public domain at the time of the 1882 Act. Their only theory could be that it came out one by one as the parcels were acquired, and that is totally contrary to the Supreme Court case law. That would mean that in every case, once there's land is acquired, by an under-surplus land that comes out of the reservation, of course, would be totally unworkable. So I do want to note that, actually, interior... Yes. Well, the Yankton Sioux... But the Yankton Sioux checkerboard arose from a little bit different situation. Right, I mean, there was session language in which all of the unallotted area was ceded, so that you had all the... Okay. Well, I mean, I understand. I think one of the hardest parts of the Yankton case is the theory that which isn't at issue here is what happens to the land after it goes out of allotment, which is, you know, sort of a next-stage issue that doesn't have to do here. Anyway... My understanding is it's just the Senate senators who discussed with the tribe reported back to the Senate, and it's just in the legislative history. We don't view consent... I believe that's correct. And if you look at the history by the tribe's expert, you know, there was a minority, actually, that approved it, but they were a vocal minority. But I don't think we consider that relevant one way or the other. It's true that there has never been a diminishment found in a situation where a surplus land act was approved by a tribe, because otherwise the tribes required a sum certain, right? Tribes knew they didn't want to just give up all their reservation based on the possibility that some of the land would be sold, which is particularly true here, because only two parcels, or 300 acres, were sold under the 1872 Act. I mean, the tribe knew it was risky whether there would be... the land would actually be sold in the 1882 Act, so they certainly were not giving up all sovereignty and all, you know, authority over those lands for all time. I did want to clarify one point, or maybe two. One, the Interior Department said in 1900 that the land could... It was 1900 after the Dawes Act that the land could not be homesteaded on the west side of the reservation because it was reservation land. And that is at page 21 of our brief and found in appendix page 142. On the major crimes discussion, Nebraska ceded... or what it retroceded jurisdiction. So there's a statute that allows state... well, that gave Nebraska... in the 60s... and other states. The United States gave its criminal jurisdiction in Indian country to Nebraska. Then it allowed that to be ceded back to the United States, which Nebraska did because it was expensive and they wanted to put the money on the federal government instead. You said them by reservation, by reservation, the retroceding? Well, actually, it was here because they sought to retrocede both the Winnebago and the Omaha reservation. So, you know, at the time... like Thurston County was... until they took it off their website in 2012, thought to be entirely encompassed by these reservations. But the Winnebago, when the Secretary of the Interior has authority, and there are actually cases in 8th Circuit case about this, to not accept all of the retrocession, and they did not accept the retrocession over the Winnebago because the Winnebago didn't approve it. Anyway, when that was retroceded, because of that distinction between the two tribes, the United States put in the Federal Register the boundaries of where it would accept the retrocession, and that was the entire reservation undiminished. And that continues to this day, and although there's been discussions about changing that, the Nebraska legislature, nobody has ever contested that that should be changed. If there's no more questions. Thank you very much. Thank you. Mr. Sala, do you want to have some time? One minute. Thank you, Your Honor. First, I'd like to clarify, in response to Judge Colleton's question, I misspoke. The percentage of Indian population east of the railroad right-of-way, according to the census data from 1900 to 2000, has ranged from 15% to 70%, and currently, as of the 2000 census, 50% to 70%? 70%. And as of the 2000 census, it's currently 70% tribe member. I apologize. I think I was thinking in terms of property ownership rather than percentage, and I don't know that there's a specific property ownership percentage in the record. And importantly, the tribe continues to have tribal offices east of the railroad right-of-way. Schools, they offer tribal services east of the railroad right-of-way. And as the record reflected, the tribe has never imposed its tribal code west of the railroad right-of-way. So there's no evidence the tribe has ever attempted to assert jurisdiction west of the railroad right-of-way, as they have east of the railroad right-of-way. Thank you very much, Your Honors. Refresh my recollection now. What's the history of events that has caused this liquor taxation issue to pop up at this time? Well, I think the history stems from the fact that for, you know, a period of, you know, more than 100 years, there's really been no attempt to exercise jurisdiction by the tribe west of the railroad right-of-way. But why did the tribe enact this liquor tax recently? It's a new tax, isn't it? Correct, Your Honor. What was the chain of events that prompted them to do that? Well, based on the legislation, the tax is an attempt to raise money for the tribe to provide alcohol and education and rehabilitation. But in terms of why that occurred, you know, in the mid-2000s… Is there any BIA approval for the tribe to do this, or is this just inherent in their governmental structure, that they have the authority to impose taxes like this? Well, my understanding is that the tribe, as a sovereign, has the authority to enact that language, but then it's subject to approval. I thought there maybe had been. I thought from the record there maybe had been some action that led to this. What was the last thing you said? It's subject to approval when? Well, I know that it had to be published in the Federal Register, but I apologize, Your Honor, I'm not absolutely certain. Who would have published that, not the tribe? It would have been the federal government, the BIA. So there was some activity that… Correct. Okay. It doesn't have anything to do with the recent problems with trying to stop the Nebraska liquor stores that are selling to the Pine Ridge residents? Yeah, this is a separate circumstance because this is not about… It's not about that area? Yeah, correct. East, yeah. East, yeah. Yeah, at least east, right? Yeah. Thank you very much. Thank you, counsel. Complex case, very well briefed and argued, so we'll take it under advisement.